IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

ANNMARIE M.,
     Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
     Defendant.

Case No. 1:18-cv-01430-JES-JEH

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 13) and the Defendant's Motion for Summary Affirmance (Doc. 17). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

Annmarie M. filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) on April 17, 2014, alleging disability beginning on September 1, 2010. Her claims were denied initially on March 5, 2015 and upon reconsideration on June 25, 2015. Annmarie filed a request for hearing concerning her DIB and SSI applications which was held before the Honorable John M. Wood (ALJ) on January 26, 2017. At that hearing, Annmarie was represented by a non-

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 8) on the docket.

1

attorney, and Annmarie and a vocational expert (VE) testified.  In a March 2017 letter, Annmarie's representative, on her behalf, amended her alleged onset date to April 16, 2013, reviving the DIB claim she voluntarily dismissed at the January 2017 hearing.  A supplemental hearing before the same ALJ was held on September 14, 2017 at which time Annmarie was represented by the same non-attorney as before, and Annmarie, Medical Expert (ME) Leon Kwock, M.D., and a VE all testified.

The ALJ issued an unfavorable Decision on September 28, 2017.  Annmarie's request for review by the Appeals Council was denied on August 1, 2018, making the ALJ's Decision the final decision of the Commissioner.  Annmarie filed the instant civil action seeking review of the ALJ's Decision on November 29, 2018.

## II

At the January 26, 2017 hearing, Annmarie testified that she was 50 years old and lived in a trailer with her children ages 10, 11, and 12 and sometimes also her 25-year-old son.  She claimed in May 2014 that the following conditions limited her ability to work:  degenerative disc disease; seizures; broken pelvis; anxiety disorder; pinched nerves in back; and restless leg syndrome.  AR 447.  She last worked as a Registered Nurse (RN) in 2007.

Annmarie testified that a ramp was installed at her home because she came home from the hospital in 2013 with a wheelchair.  That hospitalization in 2013 was due to a fall she took, she believed in November 2013, which caused a left hip tear.  She said before the ramp was constructed, someone would lift her in the wheelchair off the edge of the porch when she left the house.  She said the orthopedist she visited in Springfield, Illinois said Annmarie could not receive injections in that hip because the needle would have to be curved to reach the problem in her hip.  She said she received no other treatment for the hip since then except she took pain medication.

As for the evidence in the record of seizures, Annmarie testified that she took "a lot" of medication for seizures and she had them "[s]ometimes once a week, sometimes, you know, it will be less frequently." AR 116. She said she saw her regular general practice doctor for her seizures, and her neurologist told her she needed to reduce stress in her life and take her medications. Her first grand mal seizure occurred sometime in 2007 when she was out in public.

She testified she had significant issues with her back, pain in her mid to lower back, that pre-dated the grand mal seizure in 2007. She rated that pain as an eight or nine out of 10 and she had that pain "[e]very day all day." AR 124. At that time, she walked with a prescribed cane and was on pain medication. She believed she had physical therapy at that time.

As for the last two to three years leading up to the hearing, Annmarie testified there were no times when she was able to walk around her home without the wheelchair. She explained she could not put weight on her left leg, and her left hip socket did not feel the same as her right hip socket. She answered that she literally had basically not been able to walk since 2014. She had home health come out to her home upon her return from the hospital in December 2013, and they provided physical therapy and occupational therapy so that she was able to transfer in and out of the bed, from a chair to the toilet, and the like. Annmarie confirmed she needed someone to help her transfer from the wheelchair to the toilet and back and to the bed and back. Annmarie's representative then asked the ALJ for additional time to supplement the record, which the ALJ allowed, and the VE was then questioned.

At the supplemental hearing on September 14, 2017, ME Dr. Kwock testified he reviewed every exhibit except progress notes from Annmarie's general practice doctor dated September 4, 2015 to July 21, 2017, as those were not provided to him. Annmarie's representative did not object to pursuing the ME's testimony at that

3

time.  ME Dr. Kwock testified Annmarie had the following medically determinable impairments or conditions since April 2013:  degenerative disc and degenerative joint disease present in the cervical spine, thoracic spine, and lumbar spine; mild osteoarthritis of the left hip; mild variant of the hip join that called Coxa Profunda; and very early stages of osteoarthritis of the left knee.  He opined none of those impairments singularly would have met a listing, nor would they have in combination come to equal a listing.  He opined those impairments resulted in functional limitations:

> The nature of the impairments and their severity would warrant protection in the work environment.  I believe the record would still support a light work exertional level.  That is to say that she can lift and carry up to 10 pounds on a frequent basis, between 11 and 20 pounds occasionally, and anything above 21 pounds never.  Sit, stand and walk, it's my opinion that she can still sit for eight hours out of the eight, stand and walk for eight hours out of the eight.  Posturals would be appropriate, the climbing of stairs and ramps should be limited to frequent.  The climbing of ladders or scaffolds, frequent, balancing is to be continuous.  Stooping is frequent, kneeling is to be continuous, crouching is frequent, crawling would be occasional.

AR 157-58.  He opined further there were no upper extremity limitations and no environmental limitations.

Upon questioning by Annmarie's representative, ME Dr. Kwock testified that he was board certified in orthopedic surgery, his entire career was surgical, and his comments were, for the most part, limited to the musculoskeletal system.  "So seizures are not part of my comments."  AR 159.  As for Annmarie's alleged history of stroke, the ME stated that he could comment on the muscular residuals of a stroke.  He indicated there was evidence of stroke syndrome without residual.

With regard to Annmarie's left hip, ME Dr. Kwock testified that degenerative changes of the hip appeared in a December 2013 x-ray of the left femur which included the left hip and a pelvis x-ray done on December 5, 2013.

He said there was nothing about that degenerative change to suggest that it was traumatic in nature, "et cetera."  AR 161.  He went on:

> She does have Coxa Profunda.  And so I think from the medical standpoint, these changes are osteoarthritic in nature, not traumatic. And if they are, then they would have slowly developed prior to even 2013 to the point where in 2013, there is now sufficient x-ray findings to have a radiologist mention those changes.

AR 161-62.  Annmarie's representative pointed out her December 2013 fall, prior to which she was not in a wheelchair and that she "is, for sure, since December of 2013, unable to ambulate."  AR 163.  He asked ME Dr. Kwock, "And so is it your testimony that there would be no objective basis to support that she would be unable to ambulate?"  *Id*.  The ME responded:

> Yeah, I believe that is correct, counsel.  This record that I have has evidence in it that suggests there's no medical reason, physiological reason why this individual would not have been full weight bearing, protesting a full ambulatory status.

*Id*.  He also confirmed that, in his opinion, there was no period of time in the record that Annmarie would have been unable to ambulate, including that very hearing day.  He acknowledged that "people can have good days and bad days to the point where maybe she was unwilling to walk.  But in general, in whole, there's no physiological anatomical reason that I see in this record why this individual cannot be fully ambulatory."  *Id*.  There was no reason why she could not stand and walk eight hours in a workday.  As for the MRI of Annmarie's left hip that described the state of the hip as "internal derangement," ME Dr. Kwock explained that meant, in general, the joint had elements that were not normal; "most of us would probably just simply say arthritis."  AR 165.

The ALJ then pointed ME Dr. Kwock to consultative physical examiner Vittal Chapa, M.D.'s evaluation in which Dr. Chapa did muscle testing on

Annmarie. Dr. Kwock testified that such manual muscle testing is to some degree an estimation or what is to be expected from the individual. He said also, in his opinion, muscle testing was unfortunately subjective to some degree; "In other words, the individual has cooperated with it[.]" AR 169. "There's nothing in the world that can measure whether somebody is putting forth full effort in demonstrating what he can do as far as power is concerned." *Id*. Dr. Kwock agreed with the ALJ that Dr. Chapa indicated that he limited Annmarie's capacity based upon subjective symptoms. Dr. Kwock also testified, "If you're [Annmarie's representative] asking me that if, you know, just as a theoretical thing that if somebody had a three over five reflection would that affect their ability to ambulate, then yes." AR 173. Upon further questioning by the ALJ in that regard, Dr. Kwock answered, "The three over five strength observation is inconsistent with other findings with radiological studies with other evidence that is available to a physician." AR 174.

The VE next testified that there "would be a variety of jobs" available to an individual of Annmarie's age, education, and work history who was limited to light work, no climbing of ladders, ropes, or scaffolds, other postural functions performed occasionally, a need to avoid environmental hazards, a need to avoid concentrated exposure to pulmonary irritants, performance of simple repetitive tasks that would involve little or no change in work routine, and occasional interaction with the public, coworkers, and supervisors. AR 176-77. Annmarie's past work would be eliminated. An additional limitation to the need to alternate between a standing position and a seated position, if desired, up to four hours each at no more than 30-minute intervals would still allow the individual to perform jobs such as labeler, folder, and polisher.

### III

In his September 2017 Decision, the ALJ initially explained the reasons why he rejected Annmarie's representative's request at the end of the September 2017 hearing that a medical expert be ordered to examine the entire file and to assess the possible presence of a somatic disorder under Listing 12.07 as the representative argued there was no objective physical basis for her inability to ambulate.  The ALJ stated that he found the record to be fully developed (two hearings, over 1800 pages of medical records involving Annmarie's physical and mental health), she did have severe physical functional limitations premised upon objective medical evidence, she did have severe mental impairments with discernible mental function limitations, the representative's request was predicated upon an assumption Annmarie used a wheelchair practically exclusively since aggravating her hip, and he found the request untimely given the "extant" development and the two hearings.  The ALJ further stated that the "underlying premise of the representative's contention is not accurate," and the record evidence did not establish that Annmarie genuinely believed she was confined to a wheelchair.  The consultative examiner (Dr. Chapa) went out of his way to explain that if Annmarie had been confined to a wheelchair for the last two years preceding his evaluation in April 2017 some amount of muscle atrophy would be expected in her lower extremities, yet she had no muscle atrophy in her lower extremities and, in fact, both of her lower extremities were "quite muscular." AR 33 (citing AR 2272).  A fraud unit investigation conducted in Annmarie's matter during the fall of 2014 and into the winter of 2015 indicated there was no wheelchair ramp at the entrance to her residence and was not built until April 2015 which was over a year after she began using a wheelchair.  Annmarie stated that in her home she used a wheeled walker with a seat that she considered to function

as a wheelchair, and she stated she used the walker at all times in the home unless she was in a really tight area where she tried to hang onto the walls.

The ALJ then stated:

More significantly, records from the weeks and months immediately following the left hip injury (the time period during which it would be most reasonable for some type of assistive device to be potentially necessary) do not demonstrate that the claimant was confined to a wheelchair or believed she was confined to a wheelchair.

AR 34. The ALJ detailed:

- On December 16, 2013 it was noted Annmarie's ambulation was steady with use of a walker.
- On December 19, 2013, it was noted that Annmarie ambulated with a walker.
- On December 22, 2013, Annmarie was using a wheeled walker.
- On December 24, 2014, the wheels of the walker were adjusted for better clearance in her cluttered trailer home.
- On December 26, 2013, Annmarie stated she used the wheelchair in the kitchen only. It was noted she lived in a cluttered environment with decreased walkways through doorways, she had difficulty using the wheeled walker through the trailer, and so she held onto the wall and furniture. Annmarie demonstrated ambulation with no device, but had difficulty putting full weight on the left lower extremity.
- On January 9, 2014, Annmarie had an antalgic gait in the home and used the furniture to help her walk.
- On January 15, 2014, Annmarie stated she needed her left shoulder pain decreased so she could use her wheeled walker better.
- On January 24, 2014, Annmarie stated she was not using her wheeled walker in the crowded trailer but was getting up more.
- On January 27, 2014, Annmarie stated she only used the wheelchair in the kitchen.
- On February 28, 2014, Annmarie stated she had increased left hip pain, and she used the walker but was on her feet more the day before.

8

- On March 10, 2014, Annmarie was independent in gait/ambulation for short distances in the home and she was independent in all transfers except for getting up from the floor.
- On March 18, 2014, Annmarie could ambulate with limited weightbearing.
- On March 20, 2014, it was noted Annmarie walked with a quad cane.
- On April 2, 2014, Annmarie was noted to have an antalgic gait, but walked independently.
- On April 18, 2014 at an orthopedic evaluation, Annmarie walked with an antalgic gait and shuffled her gait on the left side.

AR 34. The ALJ continued, "The allegations of being confined to a wheelchair do not begin until after the claimant filed her applications for disability benefits [April 17, 2014], despite no new injury or documented worsening of her existing impairments." *Id.*

At Step Two of the disability evaluation, the ALJ determined Annmarie had the following severe impairments: a spinal disorder; a let hip disorder; degenerative left knee; history of asthma; history of seizures; affective disorder; and anxiety-related disorders (generalized anxiety disorder and PTSD). AR 37. At Step Three, among other things, the ALJ determined Annmarie's history of seizures did not meet or medically equal the former or current epilepsy listings. He pointed out that: there was no objective medical evidence to substantiate the alleged frequency (weekly) of her seizures; she typically saw her neurologist once a year despite alleging uncontrolled seizures, which was not the expected visit frequency if seizures truly were as frequent as she alleged; in June 2013 her neurologist discussed plans to decrease seizure medication which would seem inconsistent with an uncontrolled seizure disorder; a lab test in August 2013

indicated a subtherapeutic Tegretol[2] level raising a question of consistency of medication compliance; and she reported seizure-like activity on May 5/6, 2014, but admitted she was out of medication due to a mix-up between the pharmacy and her new doctor.

> The ALJ made the following residual functional capacity (RFC) finding:
>
> [T]he claimant has the [RFC] to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b) except the ability, if desired, to alternate periodically equally between a standing and a seated position at no more than thirty minute intervals; no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; no climbing of ladders, ropes, or scaffolds; no work at unprotected heights or around unprotected hazardous machinery; no concentrated exposure to pulmonary irritants; performance of simple repetitive tasks involving little or no change in work routine; and no more than occasional interaction with the public, coworkers, or supervisors.

AR 44-45. In support of that finding, the ALJ discussed the record evidence over the course of 43 pages. He listed her medications during that time, her disability reports, her Activities of Daily Living Questionnaire, her physical impairments questionnaire, a third-party function report completed by her friend Chelsea Cook, her medical records dated between 2010 and 2017, her home health visits, her ER visits due to hip pain and seizures, her psychological consultative evaluation, her consultative physical evaluations, her comprehensive mental health assessment, and her psychiatric evaluation. The ALJ also indicated the numerous instances Annmarie reported that she was wheelchair bound and the

---

[2] Tegretol is the trademark for preparations of carbamazepine. DORLANDS.COM, https://www.dorlands.com/dorlands/def.jsp?id=100106037 (last visited Feb. 24, 2020). Carbamazepine: "an anticonvulsant and antineuralgic, used in the treatment of pain associated with trigeminal neuralgia and in epilepsy manifested by tonic-clonic and partial seizures, administered orally." DORLANDS.COM, https://www.dorlands.com/dorlands/def.jsp?id=100016972 (last visited Feb. 24, 2020).

numerous instances others (specifically medical professionals) observed Annmarie to be in a wheelchair. The ALJ identified Annmarie's gamut of complaints throughout the relevant time period such as headaches dizziness, seizures, hip pain, irritability, memory issues, broken teeth, hand and feet numbness, anxiety, shortness of breath, confusion, and stomach ulcers.

The ALJ acknowledged Annmarie's statements that her seizures were brought on by some type of stress and that she was wheelchair bound as a result of a fall that broke her pelvis and tore the inner lining of the socket of her hip which she stated was non-repairable. The ALJ elaborated upon the medical records pertaining to Annmarie's December 2013 fall which injured her left hip and the treatment she received in the several months following that incident. At her December 5, 2013 ER visit, there was a significant area of contusion and soft tissue damage over the left anterior thigh. "Despite no radiographic evidence of recent fracture, the claimant was assessed with a fracture of the acetabulum[3]." AR 53. She was instructed to be non-weightbearing, and because she was unsure if she would be able to use crutches all the time, she was given a script for a wheelchair. The ALJ explained that subsequent records made clear there was no fracture; radiographic imaging did not reveal any evidence of pelvic fracture. She was back in the ER on December 6, 2013 and was hospitalized until December 12, 2013 due to acute left hip pain and iatrogenic hyperthyroidism. A medical note at that time provided:

> Despite pain medication here the PT states her pain is not controlled. I cannot find a cause for the PT's pain. I suspect the PT is narcotic tolerant and is unwilling to deal with any type of pain. PT regularly receives hydrocodone scripts . . . PT does have a bruise on the leg but

---

[3] Acetabulum: " the large cup-shaped cavity on the lateral surface of the [hip bone or pelvic bone] in which the head of the femur articulates." DORLANDS.COM, https://www.dorlands.com/dorlands/def.jsp?id=100000701 (last visited Feb. 24, 2020).

> I am unable to explain why the PT cannot tolerate the pain or ambulate with crutches. Will admit for obs.

AR 53-54. While in the hospital, she was seen by orthopedics which recommended weight-bearing as tolerated, physical therapy, and pain control "as there was no fracture," and physical therapy recommended continued use of a walker. AR 54 (citing AR 1037-38). Records indicated Annmarie received nursing and physical therapy services from Unity Point Home Health Services from December 13, 2013 to April 3, 2014. The clinical findings which supported the need for those services was severe pain and left hip contusion. Annmarie received physical and occupational therapy and nursing services. Annmarie additionally received the services of a personal assistant between September 30, 2014 and February 15, 2015 "around five hours a day." AR 70. The ALJ noted only timesheets were provided, "so the exact nature of the services provided or the basis for the services is not indicated." *Id*. The ALJ also noted the personal assistant was Chelsea Cook, Annmarie's friend who completed the third-party function report in July 2014.

On April 1, 2014, PA-C David Purves told Annmarie hip arthroscopy was not something his office did, "but it definitely could be considered, although I do not think all her pain is coming directly from her hip joint." AR 62 (citing AR 1263). On April 18, 2014, Annmarie was evaluated by orthopedist Brett Wolters, M.D. (in Springfield, Illinois) for left hip pain that began in December 2013. He said she had some mild degenerative changes that were not consistent with acute trauma to the left labrum itself, he recommended continued physical therapy, and he said her best chance would be to consider an injection to the hip. As for an injection, Dr. Wolters said given Annmarie's history of problems with injections (she reported a shot caused arrhythmia and a hospital visit and she had a history of epidural steroid injection with grand mal seizure three weeks later), such might not be advisable. Dr. Wolter's stated he did not think any surgery would be

helpful to any tremendous degree.  At an April 21, 2014 appointment with another doctor, Annmarie said that due to the time lapse, she had arthritic changes and surgery would cause more problems due to scarring, and Dr. Wolters would not do surgery.  The ALJ noted that the records from Dr. Wolters made no mention of too much time having passed for surgery to be done or that scar tissue was an obstacle to surgery.  In August 2014 Annmarie reported to the consultative physical examiner that Dr. Wolters told Annmarie too much time had lapsed and there was too much scar tissue to do any arthroscopic repair, and she asked Dr. Wolters about injections and he said he could not go so deep.  Annmarie reported to a doctor in September 2014 that Dr. Wolters said hip replacement was not an option "2/2 fear of doing more damage" and that her hip was fragile.  AR 67 (citing AR 2245).  The ALJ again noted such claims by Annmarie were inconsistent with Dr. Wolters' records.

Annmarie established as a patient with George Gilbert, M.D. in April 2015. She said that ever since a left hip fracture she had been unable to ambulate and reported a pain level of 7/10.  At Annmarie's May 2015 visit, Dr. Gilbert referred her for a pain management consultation.  At a January 2016 visit, Dr. Gilbert assessed Annmarie with chronic pain and instructed Annmarie to work on reducing hydrocodone intake to the lowest tolerable dose.  He instructed her to work on reducing hydrocodone use again on March 9, 2016, April 20, 2016, June 3, 2016, September 1, 2016, and July 17, 2017.  As for Annmarie's use of pain medication, the ALJ detailed the evidence pertaining to such use beyond Dr. Gilbert's repeated instruction to reduce it.  A doctor in September 2014 noted that ideally Annmarie would not continue on narcotic pain relievers.  Another doctor in September 2014 initiated opioid protocol as Annmarie was taking Norco, offered an Illinois Neurological Institute evaluation (declined by Annmarie), and

highly recommended follow-up with an orthopedist. That doctor noted Annmarie became defensive when informed about protocol.

Dr. Gilbert completed a Physical Residual Functional Capacity questionnaire on January 25, 2017. He said her diagnoses were cerebral infarction and convulsions and the clinical findings and objective signs were left hip x-ray and left-sided weakness and difficulty. He said Annmarie's impairments were likely to produce good days and bad days, he opined that she would miss more than four days of work a month due to her impairments or treatment, and he commented that she was unable to work. The ALJ concluded, "The opinions expressed by Dr. Gilbert are deserving of essentially <u>no</u> weight." AR 76 (emphasis in original).

Consultative physical examiner Dr. Chapa performed his examination on April 18, 2017. He noted there were some conflicting issues regarding Annmarie's history. Upon examination, Annmarie's left hip strength was 3/5, she said she could not get on the examination table and she would not stand up or walk, saying she had left hip pain, she had normal sensation and reflexes, she complained of left hip pain during straight leg raise at about 40 degrees, she had limited range of motion of the left hip, and she had full range of motion of all other joints. He assessed history of internal derangement of the left hip, history of seizures, and history of degenerative disc disease. He explained that Annmarie stated she had been in a wheelchair for the last two years, was unable to stand, was unable to walk, and needed help with her daily activities. He then commented that she had "quite muscular" lower extremities without any muscle atrophy. Dr. Chapa also provided an April 21, 2017 Medical Source Statement of Ability to do Wok-Related Activities (Physical) in which his opinion as to restrictions as to Annmarie's lower extremity use was based upon her subjective symptoms of inability to stand or

walk and her subjective history of wheelchair confinement. The ALJ determined the value of Dr. Chapa's Medical Source Statement was "rather limited." AR 81.

In February 2015, a State Agency medical consultant opined that Annmarie could perform light work with occasional climbing of ramps and stairs, no climbing of ladders, ropes, or scaffolds, and no concentrated exposure to hazards, but was otherwise unlimited. That same month, a State Agency psychological consultant opined that Annmarie's affective and anxiety disorders imposed a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. A second State Agency psychological consultant affirmed that assessment "with some slight differences" in June 2015. AR 83. The second consultant opined Annmarie had moderate difficulties in activities of daily living which the ALJ said was "presumably" based upon Annmarie's alleged uncontrolled seizures, cognitive functions slightly below expected developmental limits, and the fact she earned an RN in nursing. *Id*.

The ALJ next addressed Annmarie's representative's statement that no treating or examining source ever concluded she was a malingerer. The ALJ clarified that one record wherein a psychiatric consultation was ordered to assess the possibility Annmarie was malingering (which did not reveal such malingering) was in relation to unexplained abdominal pain. The ALJ emphasized that, "There is no indication of any evaluation specifically devoted to determining the validity of the claimant's allegation of inability to stand or walk and confinement to a wheelchair." AR 83. He observed further:

> While it is certainly true that no medical professional has specifically stated the claimant was a malingerer, multiple medical professionals have raised questions or concerns about the claimant's allegations and performance on examinations. Moreover, there are multiple

15

instances where the claimant has engaged in symptom magnification or has provided false or misleading information to a medical provider.

*Id*. The ALJ then provided examples: she repeated false claims of pelvic fracture and stroke; she said her hip was fragile without any evidence that any treating or examining source had told her it was such; she alleged extreme pain while appearing in no distress (and in moderate distress in just once instance); she complained of slurred speech (which was clear when talking to the hospital staff); she spoke slowly when she felt staff noticing her but spoke at a normal rate with no deficits when talking to medical staff about her pelvic pain (per a treatment note); and upon returning from an x-ray which was done due to pelvic pain complaints, she did not flinch when going over a bump into the room or when her bed was lowered to the ground making a bump and she adjusted herself in the bed without difficulty.

The ALJ provided more examples. Dr. Wolters noted that Annmarie's pain "seems to be somewhat over exaggerated. Touch, mild palpation to the leg causes severe overreaction with regard to pain." AR 86 (citing AR 1261). During a hospitalization related to gastric ulcers, the doctor noted that Annmarie was in no acute distress until she saw the doctor enter the room, at which time she began moaning and crying as if in pain.

In September 2014, DDS sent a referral to the Chicago Cooperative Disability Investigation Unit expressing suspicion that Annmarie was malingering based upon her observed behavior at a consultative examination. Annmarie was observed sitting in a wheelchair outside the SSA office, and during an interview with a Management Support Specialist, Annmarie fell asleep a dozen times, seemed disoriented, did not answer several questions, was well groomed and appropriately dressed, did not express any pain, her speech was unclear and she

mumbled often, and she sat in a wheelchair during the entire interview. While Annmarie did not have an answer for how she entered her residence in a wheelchair where it was not wheelchair accessible, Annmarie's boyfriend answered that he assisted her.

The Director of Operations for Meridian Health Plan provided on January 27, 2017 that a wheelchair ramp was built for Annmarie in April 2015 because she was in a wheelchair and unable to leave the home without the ramp. The director stated the request for the ramp was submitted by Annmarie's doctor (whose records were discussed elsewhere in the ALJ's Decision), but the director did not have a copy of the medical records that were included with the request. The director also provided that Annmarie was on a disabilities waiver and received waiver services in the home for a total 35 hours per week, those services started in March 2015 and were still occurring, and the information only went back to March 2015 which was when Annmarie became effective with Meridian. The ALJ noted the medical records from around April 2015 did not document medical findings that would substantiate the need for a wheelchair or personal assistant services.

## IV

Annmarie claims:   the ALJ erred in Annmarie's subjective symptom analysis; the ALJ's RFC is not supported by substantial evidence; and the ALJ's finding of moderate limitations in concentration, persistence, or pace fails to support a RFC of simple repetitive tasks.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the

Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. §§ 404.1566 and 416.966[4]. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

---

[4] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI). Thus, the Court may at times only cite to the DIB regulations.

2)    suffers from an impairment that is severe or whether a combination of her impairments is severe;

3)    suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4)    is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5)    is unable to perform any other work existing in significant numbers in the national economy.

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Annmarie claims error on the ALJ's part at Step Four.

**A**

Annmarie takes issue with the ALJ's subjective symptom evaluation for several reasons. She argues the ALJ's implication that she applied for disability due to reasons other than actual disability, the ALJ's contention that she exaggerated the time she worked as a nurse, and the ALJ's statement that she misrepresented her activities in 2013 prior to her December 2013 fall were attacks on Annmarie's character which SSR 16-3p sought to avoid as it clarified

"subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, at *2. She contends it is unclear how such things weakened her subjective statements as to pain. Annmarie also argues that the ALJ cherry picked the record to allege there was symptom magnification, and by drawing his own conclusion that her record confirmed numerous references to symptom magnification, he played doctor. The Commissioner counters that the ALJ reasonably noted Annmarie's objective medical records and at least three medical opinions contradicted her claim that she could not walk, and her attempts to contradict evidence the ALJ relied upon to support his subjective symptom evaluation amounts to a circular argument because the information she references is itself subjective.

SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity and persistence of an individual's symptoms to "determine how [those] symptoms limit [the individual's] ability to perform work-related activities." SSR 16-3p, at *2. The ALJ must consider the claimant's subjective statements, the objective medical evidence, and factors relevant to symptoms including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional imitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8; 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ methodically discussed, as set forth above in Section III, the evidence pertaining to Annmarie's left hip injury following a fall in December 2013. He explained Annmarie's allegations of being confined to a wheelchair did

not begin until after she filed her DIB and SSI applications in 2014, despite no new injury or documented worsening of her existing impairments. From there, the ALJ detailed ME Dr. Kwock's testimony that based upon his review of the medical records there was no physiological basis for her alleged confinement to a wheelchair, and his opinion that she could stand or walk throughout an eight-hour workday. The ALJ also detailed orthopedist Dr. Wolters' notes that Annmarie's pain "seems to be somewhat over exaggerated," that her pain "seems a little bit of out of proportion," and that he did not think "any surgery is going to help her to any tremendous degree." AR 61 (citing AR 1260-61). Consultative physical examiner Dr. Chapa commented that "the physical findings of [Annmarie's] lower extremities do not support her history stating that she has been confined to a wheelchair for the last two years." AR 79 (citing AR 2272-73). The first State Agency medical consultant specifically noted there was no "definitive [diagnosis] that would reasonably cause a significant restriction to require a wheelchair" and there was "no conclusive medical evidence to support the need for an assistive device." AR 82 (citing AR 244). That assessment was confirmed by another State Agency medical consultant. The ALJ also pointed out that there was no objective medical evidence of stroke and, in one instance in September 2014, the diagnosis of stroke was based upon Annmarie's own subjective allegations.

It is abundantly clear to the Court that the ALJ found overwhelmingly compelling the fact that the objective medical evidence of record showed an absence of findings to support the claimed intensity, persistence, and limitation of Annmarie's left hip injury and the fact that several medical professionals expressly stated as much. While an ALJ may not discount a claimant's statements about her symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms the claimant alleges, that is not what the ALJ did here. SSR 16-3p, at *5. He had the insights of trained doctors as well.

21

Obviously, the ALJ's focus upon the discrepancies that existed throughout the record was in response to the glaring discrepancy between Annmarie's claim that she was wheelchair-bound and substantial evidence that there was no medical basis for that claimed limitation. It was therefore not improper for the ALJ to factor into his evaluation of Annmarie's symptoms her misrepresentations as to diagnoses and information about her medical conditions to different doctors and her other misstatements made throughout the relevant period. In other words, the ALJ built a logical bridge from the abundant evidence of discrepancies in Annmarie's statements in several regards in several instances to his conclusion that her statements specifically regarding the extent of her symptoms could not be reasonably accepted as consistent with the record evidence as a whole. To satisfy the substantial evidence standard, "the ALJ must build an accurate and logical bridge from the evidence to [his] conclusion" and "an ALJ may not ignore evidence that undercuts [his] conclusion." *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018).

Annmarie fails to convince the Court that the ALJ committed reversible error in his consideration of the instances Annmarie engaged in symptom magnification. To the extent SSR 16-3p expressly calls upon ALJs to evaluate the intensity and persistence of an individual's symptoms, it cannot be reversible error for an ALJ to consider any evidence of malingering which is defined as "the willful, deliberate, and fraudulent feigning or exaggeration of the symptoms of illness or injury, done for the purpose of a consciously desired end." DORLANDS.COM, https://www.dorlands.com/dorlands/def.jsp?id=100062708 (last visited Feb. 24, 2020). Nor does Annmarie convince the Court that the ALJ "cherry-picked" facts that showed symptom magnification where the ALJ's 60-page Decision included extensive discussion of the evidence that cut both ways. As the Commissioner points out, however, much of the evidence that cut in favor

of Annmarie (and which she identifies in her brief) was her own subjective statements and so her argument is indeed circular in this regard.

For instance, with regard to the residuals of memory loss due to a stroke, Annmarie points to a treatment record where the doctor wrote in the "*Subjective*" section of the treatment note that Annmarie "Reported history of Stroke in 2014 . . . Patient still has some weakness in left arm and legs since stroke." AR 1462 (emphasis added). Annmarie also points to a treatment record where the doctor wrote in the "*Subjective*" section of the note "Stroke caused changes to memory" and therefore wrote in the "Diagnoses attached to this encounter" section "Memory loss." AR 1339-40 (emphasis added). In his Decision, the ALJ explicitly addressed treating Dr. Gilbert's opinion wherein he said one of Annmarie's symptoms was limited memory as a residual injury from a stroke. The ALJ provided reasons that undermined Dr. Gilbert's statement: a review of his medical records did not appear to suggest he performed memory testing or otherwise documented objective evidence of memory deficits; and there were numerous examinations where Annmarie's memory, including short-term memory, was reported as intact or normal. Elsewhere in his Decision, the ALJ emphasized that there was no objective medical evidence of a stroke. *See, e.g.*, AR 58 (NIH stroke score 0); AR 66 ("there is no objective medical evidence of stroke, as the incident in January 2014 was diagnosed as a seizure"). The ALJ did not play doctor by rejecting statements as to symptoms of stroke residuals where the record evidence directly contradicted Annmarie's statements that she even suffered a stroke.

As for the ALJ's consideration of the numerous times Annmarie complained of high pain levels but was observed to *not* be in "acute distress," she cannot seriously dispute that such observations were appropriate for the ALJ to take notice of. Such objective observations are relevant to the question of symptom magnification which in turn is entirely relevant for purposes of subjective

symptom evaluation.  Annmarie again attempts to dispute the accuracy of the ALJ's conclusions in this regard with her own subjective statements that appear within the record.  As for the ALJ's consideration of the fraud investigation, Annmarie argues that nothing in the investigation ran contrary to her allegations. The ALJ does not say otherwise in his Decision.  Nevertheless, the fact one was requested and undertaken is part of the record, and it adds context to the ALJ's consideration of other evidence pertaining to symptom magnification.

Finally, the ALJ did not, as Annmarie suggests, entirely disregard alleged limitations due to seizures.  Annmarie says her seizures are more than a *de minimus* impairment and the ALJ apparently found her seizures to be non-severe.  Per SSR 16-3p and 20 C.F.R. § 404.1529, the ALJ considered the frequency of Annmarie's seizures (identifying the times Annmarie complained of seizures and the frequency of seizure activity she and Dr. Gilbert reported), her reports that stress precipitated them (and that Dr. Gilbert reported stress aggravated her convulsions), and the medication she took to control them (including when she missed doses).  Notably, the ALJ explained Annmarie's seizure disorder had been variably controlled:

> but the medical records do not document seizures with nearly the frequency alleged and there have been occasions where seizures occurred when the claimant had a subtherapeutic medication level or was off medication for an extended period due to issues obtaining medication.

AR 88.  Later, the ALJ explained that in consideration of Annmarie's seizure disorder, he adopted the State Agency limitations of occasional climbing of ramps and stairs and no climbing of ladders, ropes, or scaffolds and imposed additional restrictions of no more than occasional balancing, stooping, kneeling, crouching, and crawling, and he also precluded work at unprotected heights or around unprotected hazardous machinery due the combination of Annmarie's orthopedic

impairments, seizures, and any element of distraction from mental impairments, pain, or medication side effects.  In light of all this, Annmarie's attempt to assign error to that portion of the ALJ's subjective symptom evaluation pertaining to her seizures falls flat.  The ALJ's subjective symptom evaluation is substantially supported.

## B

Annmarie argues that the ALJ points to no evidence which supports his RFC finding as the evidence fails to support that Annmarie could ambulate any distance let alone stand for the four hours allowed by the ALJ's RFC finding.  She specifically takes issue with the ALJ's determination that treating Dr. Gilbert's opinion was entitled to "essentially no weight."  The Commissioner argues that the relevant objective medical evidence supports the ALJ's RFC finding.  As for the medical opinions of record, the Commissioner argues the ALJ reasonably accepted the ME's and State Agency medical consultants' opinions and added additional limitations to account for Annmarie's seizures, and the ALJ reasonably discounted the remaining opinions where they were not supported by the records or were based upon Annmarie's subjective reports.

A claimant's RFC "is the most he can still do despite his limitations."  20 C.F.R. § 416.945(a)(1).  An RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record").

In his Decision, the ALJ made it exceedingly easy for the Court to trace the path of his reasoning in denying Annmarie's DIB and SSI claims.  *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently

articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning"). The ALJ did not ignore contrary evidence. The ALJ did not cherry pick the evidence. The ALJ did not commit legal error in his consideration of the medical opinions of evidence. To begin with, as the Commissioner argues, the ALJ's RFC finding is supported by the objective medical evidence. With regard to Annmarie's alleged limitations due to a stroke, the ALJ pointed out the January 2014 ER records documented a visit for a seizure (not a stroke as Annmarie would subsequently report)[5], her NIH stroke score in March 2014 was 0 (zero), a workup in March 2014 was negative which included a CT scan of the head (assessing her with a seizure), the medical records indicated evaluation for a stroke without residuals, and a September 2014 MRI of the brain revealed no acute infarct. The ALJ also pointed out the instances in which Annmarie reported to medical providers that she had suffered a stroke and the resulting diagnoses of stroke she received. At one point, the ALJ explained a neurologist in September 2014 diagnosed Annmarie with several things including a stroke, but, the ALJ noted, the diagnosis was "based on the claimant's subjective allegations" as stroke was not actually documented by objective clinical findings at that office visit, and "moreover, there is no objective medical evidence of stroke, as the incident in January 2014 was diagnosed as a seizure." AR 66.

With regard to Annmarie's alleged limitations due to her spinal and left hip disorder, the ALJ discussed medical records as far back at 2010 through 2012 which indicated Annmarie had degenerative disc disease. The ALJ detailed results of Annmarie's CT scans, thoracic spine x-rays, lumbar spine x-rays, MRIs

---

[5] At that time, her NIH stroke score was 0 (zero). AR 1104, 1106.

of the lumbar and thoracic spines.  He detailed her examination results which were at the various times normal, revealed positive straight leg raise tests, revealed spinal tenderness, revealed decreased range of motion, revealed normal sensation and reflexes, revealed pain to palpation, and revealed no atrophy or tone abnormalities.  The ALJ also exhaustively detailed the medical records dated between December 2013 when Annmarie injured her left hip and April 2014 when she continued to be treated for that injury (see Section III above).  When she went to the ER in December 2013 complaining of hip pain following a fall, a pelvic x-ray with lateral view of the left hip revealed no definite fracture or dislocation, and there was "a small bony fragment adjacent to the superolateral aspect of the left acetabulum, but this was present on the abdomen x-ray from January 2011, suggesting mild underlying degenerative change."  AR 53.  Also during that ER visit, x-rays of the left femur revealed no definite fracture or dislocation.  Pelvic x-rays in April 2014 revealed mild bilateral hip and sacroiliac joint osteoarthritis, evidence of coxa profunda[6] was noted, and left hip x-rays revealed mild left hip osteoarthritis.

Next, the ALJ's RFC finding is substantially supported by way of his proper evaluation of the medical opinions of record.  20 C.F.R. § 404.1527(c) provides:

> How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

The listed factors include:  1) examining relationship; 2) treatment relationship, which in turn includes length of the treatment relationship and the

---

[6] The ALJ provided in his Decision that coxa profunda "refers to a deep acetabular socket."  AR 61.

frequency of examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors brought to the Social Security Administration's attention. *Id.* An ALJ must give controlling weight to the medical opinion of a treating physician only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2).[7]

In support of his determination that treating Dr. Gilbert's January 2017 opinion was entitled to "essentially no weight," the ALJ pointed out:

- Dr. Gilbert stated Annmarie's diagnoses were cerebral infarction and convulsion. However, the medical records did not provide any evidence of a cerebral infarction (stroke) and a review of his treatment records indicated numerous diagnoses that he neglected to mention on the medical source statement, such as osteoarthritis and spondylosis, which "would seem rather relevant given complaints of chronic left hip and back pain." AR 76.
- Dr. Gilbert identified the alleged stroke as having occurred in December 2015, but the medical records, including his treatment note from December 17, 2015, did not reflect stroke or stroke-like symptoms in December 2015.
- While Dr. Gilbert alleged Annmarie was unable to stand due to left-sided residual injury from stroke, Annmarie alleged an inability to stand since December 2013 and she attributed it to a left hip injury.
- "The validity of Dr. Gilbert's opinions is [sic] greatly compromised when, of the two diagnoses he sets forth, one is not substantiated by the objective medical evidence, and he attributes to this unsubstantiated diagnosis an alleged impairment (inability to stand) that has clearly and repeatedly been linked to the left hip injury in December 2013[.]" AR 77.

---

[7] The treating physician rule found in 20 C.F.R. § 404.1527 has since been eliminated by the Social Security administration. However, the rules in § 404.1527 apply to claims filed before March 27, 2017.

- While Dr. Gilbert stated Annmarie had weekly convulsions aggravated by stress, his treatment records did not reflect weekly convulsions.  The ALJ then cited his treatment records in which Annmarie reported seizures and which did *not* reveal weekly convulsions.
- While Dr. Gilbert said one of Annmarie's symptoms was limited memory, a review of his medical records did not appear to suggest he performed memory testing or otherwise documented objective evidence of memory deficits.  The ALJ proceeded to cite and discuss Dr. Gilbert's treatment records confirming that statement.
- While Dr. Gilbert stated Annmarie had chronic pain that necessitated ongoing and supervised use of opiate pain management, he had actually been trying to wean her off hydrocodone and alprazolam and recommended substituting in more wellness strategies.  The ALJ cited Dr. Gilbert's treatment records confirming that statement.
- While Dr. Gilbert opined that Annmarie's pain and other symptoms would constantly be severe enough to interfere with the attention and concentration needed to perform even simple work tasks, his medical records did not document any appreciable deficits in attention or concentration and "certainly not to a degree that would preclude performance of simple work tasks."  AR 78.
- While Dr. Gilbert statement Annmarie was unable to walk, could only stand for one minute at a time, could sit for 30 minutes at a time, circled "less than two hours" for the question as to how long Annmarie could sit and stand/walk in an eight-hour workday, and stated Annmarie could not work, "there is no physiological evidence in Dr. Gilbert's treatment notes, or in the other medical records, that the claimant is unable to walk or that she could only stand for a minute at a time, or that sitting would be limited to thirty minutes at a time."  AR 78.  "In fact, Dr. Gilbert's records rarely ever document physical examinations that involve assessing musculoskeletal or neurologic function."  *Id*.  The ALJ also pointed out that ME orthopedist Dr. Kwock opined that Annmarie could sit for eight hours and could stand or walk for eight hours of an eight-hour workday.
- Dr. Gilbert opined to Annmarie's need to elevate her legs with prolonged sitting but he provided no rationale for that restriction

and neither his treatment notes nor other medical records supported that restriction.

- Dr. Gilbert stated Annmarie was wheelchair bound but that was not substantiated by the record evidence and many of his opinions were based upon the false assumption that Annmarie was physically unable to stand or walk and was confined to a wheelchair.

- While Dr. Gilbert opined to Annmarie's significant limitations with reaching, handling, or fingering, he provided no rationale for those limitations, the medical records did not substantiate a severe upper extremity impairment and did not substantiate any appreciable deficits in fine and gross manipulating or reaching. "In fact, a few weeks before he completed the medical source statement, Dr. Gilbert recommended completing crossword or word search puzzles to help improve memory. Completing such puzzles would require utilizing a pen or pencil or other writing instrument, an activity of fine manipulation." AR 78-79. The ALJ noted it would have made no sense for Dr. Gilbert to recommend crosswords and puzzles if Annmarie was truly incapable of performing fine manipulation with her dominant left hand. Also, if Annmarie was truly confined to a wheelchair she would have to propel it in some way and because the evidence suggested she had a self-propel wheelchair, she would have to propel it with her hands. "The records do not appear to indicate that the claimant had any particular physical difficulty operating the wheelchair." AR 79.

The ALJ summarized: "Overall, the opinions expressed by Dr. Gilbert on the medical source statement are largely predicated on false assumptions about the inability to stand or walk and need for a wheelchair are inconsistent with his own treatment records and the other medical evidence." *Id.* The foregoing so obviously illustrates the ALJ's compliance with 20 C.F.R. § 404.1527 that the Court need not address Annmarie's arguments in this regard any further. To say the ALJ in this case "minimally articulated" his reasons for giving Dr. Gilbert's opinion "essentially no weight" is an understatement. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) ("If the ALJ discounts the physician's opinion after considering

these factors, we must allow that decision to stand so long as the ALJ minimally articulate[d] his reasons—a very deferential standard that we have, in fact, deemed lax").

As with Dr. Gilbert's opinion, the ALJ clearly articulated his reasons for deciding the value of consultative physical examiner Dr. Chapa's April 2017 opinion was "rather limited," and in doing so, revealed a proper application of the relevant § 404.1527 factors.  The ALJ first detailed Dr. Chapa's April 18, 2017 consultative physical examination in which the doctor explained "Most of the findings in this claimant are subjective" and Dr. Chapa's April 21, 2017 medical source statement in which he opined Annmarie could continuously lift up to 20 pounds and frequently lift up to 50 pounds, sit for eight hours at a time and for a total of eight hours during an eight-hour workday, stand for an hour at one time and walk for an hour at one time, but could not stand or walk for any amount of time total during an eight-hour workday.  The ALJ next explained that Dr. Chapa's medical source statement was of rather limited value because the doctor repeatedly indicated on his statement that he was setting forth limitations based on Annmarie's subjective allegations of inability to stand or walk and confinement to a wheelchair, and those allegations were not substantiated by the objective evidence of record and which Dr. Chapa questioned in his report.  Finally, the ALJ explained some of Dr. Chapa's specific opinions on functioning could be accepted as consistent with the objective medical evidence, such as sitting throughout the eight-hour workday, full manipulative abilities, and no exposure to hazards.[8]

---

[8] Annmarie incorrectly argues in her brief that Dr. Chapa specifically asked to see records from Annmarie's treatment provider related to her hip and that he did not receive any such records.  In his examination report, Dr. Chapa said medical records from the physician who treated Annmarie for left hip problems would be beneficial in evaluating her further and that the physical findings of lower extremities

Lastly, the ALJ's discussion of ME Dr. Kwock's opinion and the State Agency medical consultants is free of legal error and sufficiently rooted within the record evidence.  As for the State Agency medical consultants' opinions, the ALJ set forth the initial opinion in February 2015 wherein the consultant "provided a brief summary of medical findings and specifically noted there was no definitive diagnosis that would reasonably cause a significant restriction to require a wheelchair and there was no conclusive medical evidence to support the need for an assistive device."  AR 82.  The ALJ noted that assessment was affirmed by the second State Agency consultant in June 2015.  The ALJ stated, "Based on the available evidence, the undersigned agrees with and adopts the opinions of the state agency medical consultants and Dr. Kwock . . . that the claimant is physically capable of performing the exertional demands of light work[.]"  AR 89.  The ALJ continued that, giving Annmarie all reasonable benefit of the doubt regarding a need to alternate positions at times, he included in the RFC the ability, if Annmarie desired, to alternate periodically equally between a standing and a seated position at no more than thirty-minute intervals.  The ALJ noted that Dr. Kwock testified to certain limitations based upon orthopedic impairments only.  Thus, in consideration of Annmarie's seizure disorder and asthma, the ALJ adopted the State Agency medical consultants' more restrictive limitations and even imposed additional restrictions.

In this case, the ALJ provided a robust narrative discussion describing how the evidence supported each of his conclusions, and he cited specific medical facts

---

did not support her history of wheelchair confinement.  AR 2273.  The Court notes that ME Dr. Kwock subsequently reviewed such records, opined that there was no physiological reason Annmarie could not be fully weightbearing/fully ambulatory, and the ALJ adopted Dr. Kwock's opinion.  In other words, the ALJ committed no error in his consideration of Dr. Chapa's opinion where any shortcoming it had due to the fact Dr. Chapa believed additional medical records would be helpful was remedied by ME Dr. Kwock's later testimony.

and nonmedical evidence (see Section IV.A and IV.B above).  The ALJ made no error in his RFC determination which would require remand.

## C

Annmarie also argues that that ALJ did not include all the limitations that he presumably credited by relying on the DDS reviews, and his restriction to "simple" work, defined by the regulations as unskilled work, fails to satisfy the limitations supported by this record.  The Commissioner argues Annmarie's argument in this regard is unclear as she cites evidence explicitly considered by the ALJ and admits the reviewing psychologists opined she could perform simple work despite her concentration difficulties, but then seems to claim the ALJ's RFC finding did not sufficiently account for those opinions.  The Commissioner argues the ALJ accounted for the reviewers' opinions and then some, and Annmarie's implication that he only limited her to simple work is wrong.

Annmarie attempts to exploit, without a well-reasoned or supported basis to do so, the Seventh Circuit's continual admonition that ALJs must include limitations in concentration, persistence, or pace supported by the record.  "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record."  *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).  The hypothetical must therefore "explicitly account for" deficiencies in concentration, persistence, or pace.  *DeCamp v. Berryhill*, 916 F.3d 671, 975 (7th Cir. 2019).  Here, the ALJ recited Annmarie's and her friend's statements that Annmarie had concentration difficulties, but he said those statements "indicated that it was physical problems that primarily restricted completion of typical daily activities" and "the claimant's testimony at the January 2017 hearing also indicated limited activities due to physical restrictions."  AR 43.  The ALJ cited no memory loss and intact concentration at a neurology visit in June 2013, Annmarie's ability to focus and

shift attention and comprehend and recall task directions independently in April 2014, appropriate selective attention and logical and coherent thought processes in October 2014, limited concentration in November 2014, and intact concentration in October 2015. As for the psychological examiner's statement that Annmarie's cognitive functions appeared to be operating slightly below expected developmental limits in August 2014, the ALJ stated "there is no clear indication of why he reached this conclusion." *Id.* The ALJ pointed out the following in his Decision: Annmarie's complaints of concentration difficulty; her complaints that medication side effects included trouble with concentration; her statements that she had a stroke and had severe memory disorder; Annmarie's normal mental status exams; Annmarie's memory seemed intact with respect to immediate and recall of factual information and events upon evaluation in August 2014; a GAF score of 45 in August 2014; a GAF score of 60 in November 2014; Annmarie's statements that she could not do simple math and she forgot all kinds of things; treating Dr. Gilbert's records did not appear to suggest he performed memory testing or otherwise documented objective evidence of memory deficits; Dr. Gilbert's records did not document any appreciable deficits in attention or concentration; a State Agency psychological consultant opined Annmarie's affective and anxiety disorders imposed moderate difficulties in concentration, persistence, or pace; and a second State Agency psychological consultant affirmed the first consultant's opinion of moderate difficulties in concentration, persistence, or pace. As with his subjective symptom evaluation, physical RFC analysis, and medical opinion evaluation, the ALJ laid out all the relevant evidence pertaining to Annmarie's moderate limitation in concentration, persistence, or pace and did not omit from his consideration evidence contrary to his conclusion. He once again connected the dots between the evidence of record and his mental RFC finding:

> Due to moderate limitations in concentration, persistence, or pace due
> to mental impairments, pain, and any medication side effects, as well
> as considering the alleged, but not well substantiated, memory
> difficulties, the claimant has been restricted to performance of simple
> repetitive tasks involving little or no change in work routine.

AR 89.

The first State Agency reviewer provided that Annmarie could carry out short and simple instructions, that she had difficulty carrying out detailed instructions and maintaining attention and concentration for extended periods of time, that she was capable of performing simple tasks, and that she was capable of performing unskilled work. AR 247. The second State Agency reviewer added, "From a psych perspective, and as permitted by GMC, the evidence in record indicates that the claimant retains the functional capacity to engage in unskilled vocational activities." AR 293. The ALJ's mental RFC included that Annmarie be limited to "performance of simple repetitive tasks involving little or no change in work routine." AR 45. The State Agency psychological consultants clearly determined the way to accommodate Annmarie's moderate limitations in concentration, persistence, or pace was to limit her to the performance of simple tasks or, stated another way, to engage in unskilled vocational activities. That the ALJ used much the same language, and then some ("repetitive tasks," "little or no change in work routine") convinces the Court the ALJ did as was required under *Yurt* and the other cases cited in the parties' briefs.

## V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 13) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 17) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision

of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Annmarie M., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on February 25, 2020.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE